Filed 4/24/13  P. v. Perkins CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Butte)

----

| | |
|---|---|
| THE PEOPLE, | C071411 |
| Plaintiff and Respondent, | (Super. Ct. No. 088866) |
| v. | |
| DONALD FRANKLIN PERKINS, | |
| Defendant and Appellant. | |

In 1986, defendant Donald Franklin Perkins was committed to the California Department of Mental Health after he was found not guilty by reason of insanity of first degree burglary, assault with a firearm, receiving stolen property, and battery upon a peace officer.  Defendant has been in continuous mental health treatment since that time.

In February 2012, the Butte County District Attorney filed a petition for an order extending the commitment.  After a trial to the court in April 2012, the court found beyond a reasonable doubt that defendant continues, by reason of a mental disease, defect, or disorder, to represent a substantial danger of physical harm to others and has serious difficulty controlling his dangerous behavior.  After taking judicial notice of its files and pleadings, the trial court granted the petition and ordered defendant's commitment extended for two years.

1

Defendant timely appealed to this court. We treated defendant's motion for judicial notice as a motion to incorporate the record from his most recent prior recommitment (*People v. Perkins* (Mar. 26, 2012, C066057 [nonpub. opn.]), and as such granted the motion.

FACTS

Defendant's current mental health diagnosis is axis I, "Schizophrenia, Undifferentiated Type," and "Polysubstance Dependence in Sustained Full Remission in a Controlled Environment;" axis II, "Antisocial Personality Disorder;" and axis IV, "Problems related to Interaction with the Legal System."

Napa State Hospital clinical psychologist Sandy Folker testified that, in her daily interactions with defendant, she has "seen symptoms of delusions" such as beliefs that he was not born in the United States; he is from another country; hospital staff was hired specifically to torture him; and people are being paid to say negative things about him. Folker also has seen paranoid delusions involving defendant's beliefs that his medication is poisoned or that people are out to get him. Folker and other staff have observed defendant "responding to himself and talking to himself," which usually signifies a perceptional disturbance or "possibly hearing things that other people don't hear."

Dr. Folker testified that defendant "doesn't respond effectively to situations and emotions as other people would normally." He is irritable, impulsive, aggressive, and often argumentative. When told he is schizophrenic, defendant "does not believe he has a mental illness and he often becomes argumentative and verbally aggressive, cursing and yelling."

Dr. Folker was unable to do a formal violence risk assessment because defendant would not cooperate. She testified an assessment would consider three groups of factors, the first being historical risk factors. Defendant has eight out of ten historical risk factors, which do not change over time. As to clinical factors, which are subject to treatment, defendant "has a lack of insight, a negative attitude toward treatment. Active

2

symptoms of his mental illness [are] still present. He's impulsive and currently non-compliant with his treatment." "Clinically he has all the risk factors of being a risk of harm to others," she concluded.

Dr. Folker explained that "[i]n discussions with [defendant] about his insight, he does not believe that he has [a mental illness]. He usually swears. He believes that he is being held against his will, he's being falsely accused, that he is being poisoned with his medication. [¶] He still does not believe that the incident offense occurred or he played a role in it or that's significant. So . . . when we talk about lack of in sight [*sic*], he isn't able to connect cause and effect and relationship of what the symptoms that he has had and what he has done and how that may cause him to do it again and in order for us to prevent it."

It was Dr. Folker's opinion that defendant would present a substantial danger of physical harm to others if released. She explained, "He's not compliant with his treatment, he's still actively symptomatic and right now he still requires everyday redirection and prompting from staff within a controlled environment in order to not act out aggressively and just to be able to maintain his behavior."

At that point, the trial court admonished defendant not to speak loudly to his trial counsel during the proceedings.

When asked whether defendant is capable of controlling his behavior, Dr. Folker said, "Only within a controlled environment in which we're prompting him and redirecting him every day pretty much." When asked whether defendant had tried to control his behavior, Folker said, "Not in the period of time that I have had, that I have been treating him, I haven't seen that." She said that, if discharged, defendant would not be capable of controlling his behavior.

On cross-examination, Dr. Folker was asked about defendant's job assignment of landscaping within the hospital. She said "[h]e often need[s] to be prompted or directed in order to maintain his hygiene. There are times he's been held back on the unit because

3

he's been delusional, they found him unsafe to go to work but on a day-to-day basis we're usually able to prompt him and get him to work."

When asked whether there had been any suggestion of aggressive behavior toward others while at work, Dr. Folker said "[t]he one that comes to mind was in December. He became highly delusional, he believed that one of his treating doctors at that time had machine guns and cocaine and alcohol on him. He began making threats at work."

Shortly thereafter the trial court commented: "We're having an example of impulse control because he's been told not to speak during court proceedings and he has frequently continued to do so."

When asked whether defendant's attending to his job as a landscaper and his following of directions related to his hygiene were indicative of an ability to control his behavior, Dr. Folker said defendant "does not independently control his behavior. He requires constant redirection and prompting." She acknowledged that defendant has not been physically aggressive, due to "a combination of medication and his presence within a controlled environment." When asked whether defendant's lack of physical follow-through on verbal threats is significant, Dr. Folker said, "It's important. However, him engaging in verbal aggression and cursing, yelling, making threats, the reason that's primarily not followed up on is that we have multiple staff [who] immediately respond to that and redirect him."

On redirect examination, Dr. Folker testified that, without the redirection from staff, defendant "likely . . . would be physically aggressive and hurt someone." At the time of his criminal offense, defendant was not receiving any mental health treatment or medication, was under the influence of methamphetamine, and was homeless with "active symptoms of psychosis so he was seeing things other people usually don't see or wasn't present in the environment." It is "highly unlikely" defendant would take medication if discharged due to his refusal to acknowledge that he has a mental illness.

4

On recross-examination, Dr. Folker described defendant's delusions: "So he believes he has a lot of money and is very important. And he also has many delusions that are paranoid, so people are after him or specifically hired to watch him. Currently there's a focus on the unit supervisor that she's been specifically hired by the Court and by Napa State Hospital to control our thoughts and make us say certain things."

Napa State Hospital psychiatrist Katarzyna Krawczyk testified that she has been managing defendant's medications since November 2011. Defendant takes a maximum dose of Geodon "for his psychotic symptoms which are delusions, hallucinations and also disorganized thoughts as well as his psychotic symptoms."

Dr. Krawczyk testified that she has seen symptoms of defendant's schizophrenia. "[I]n March this year just before he was transferred to jail, he disclosed to me [a] delusion that he believes that the court in Oroville and also the police in Oroville are corrupted and are being run by some authorities from San Francisco and that they -- his name was erased in the court in Oroville here in 1985. [¶] He told me that the town of Oroville does not exist any more because the people who live here were, most of them were executed on the electric chair. [¶] And that his previous, his previous psychiatrists were all -- his last opinion for extension was awarded three and a half million dollars. That would be the example of the grandiose delusions."

Defendant told Dr. Krawczyk that, over the course of his life, he has used alcohol, heroin, LSD, methamphetamine, marijuana, and PCP. That use is "very significant" to defendant's diagnosis of schizophrenia because those substances "can exacerbate or even cause symptoms like delusions and hallucinations."

Regarding defendant's diagnosis of antisocial personality disorder, Dr. Krawczyk testified that "[p]eople with anti-social personality disorder . . . commit criminal acts more than those without the diagnosis." Defendant's criminal history prior to his commitment to the Napa State Hospital included arson, drunk driving, and carrying a loaded firearm in a public place.

5

Dr. Krawczyk described defendant's present offense as follows: "[Defendant] was living in . . . his family's trailer, and he was experiencing visual hallucinations and also paranoid delusions, that he saw people, men who are hanging people by their necks from the trees and he thought that those people were coming to hurt him, to kill him and he shot at those people who later turned out to be . . . his family members."

Dr. Krawczyk stated that defendant "does not believe that there is any instant offense because he told me that he was acting in self-defense, that, that those facts really happened and this is very characteristic of delusions because if somebody is delusional, you cannot just influence their delusions by persuasion or by other means. This is what happened in his mind."

Dr. Krawczyk testified that defendant has told her on several occasions "as soon as he leaves the hospital he will stop taking medication because he doesn't need it." Even with his medication, defendant "continues to be floridly psychotic." "So I assume that if he will stop taking medication, he will become physically aggressive, that his verbal aggression will progress toward physical aggression towards others."

Dr. Krawczyk testified that defendant is unable to control his behavior. She explained that, "even in such a structured environment, he continues to be engaged in verbal aggression, very frequently. And he is forced to take his medication so once released he would not take his medication. And also he has told me when I asked him about CONREP [the conditional release program] he told me he does not want to be discharged to CONREP. So I don't think he would be able to control his behavior without having psychiatric care set up, a place to live. There's no social support." Dr. Krawczyk said that defendant's prognosis is poor.

On cross-examination, Dr. Krawczyk was asked about defendant's landscaping job. She said "I think it's pretty much a sole event where he is told what he is to do when he does that. I'm not sure if he does things in cooperation with other patients."

6

On redirect examination, Dr. Krawczyk acknowledged that acquiring the skill needed "to plant shrubs and grass" is not the same as developing skills that address mental illness. Defendant has not acquired any skills with respect to the latter.

The defense rested without presenting evidence or testimony.

## DISCUSSION

We appointed counsel to represent defendant on appeal. Counsel filed an opening brief that sets forth the facts of the case and requests this court to review the record and determine whether there are any arguable issues on appeal. (*People v. Wende* (1979) 25 Cal.3d 436.) Defendant was advised by counsel of the rights to file a supplemental brief within 30 days of the date of filing of the opening brief and to request that this court relieve appellate counsel. More than 30 days elapsed, and we received no supplemental briefing from defendant. Defendant requested that we relieve appellate counsel based on defendant's stated belief that counsel "has changed [defendant's] transcripts." We denied his request. Having undertaken an examination of the entire record, we find no arguable error that would result in a disposition more favorable to defendant.

## DISPOSITION

The judgment is affirmed.


     ROBIE     , Acting P. J.


We concur:



     MURRAY     , J.



     DUARTE     , J.

7